IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHERRY LYNN VILLARREAL, | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL NO. _____ |
| | § | |
| INTERCONTINENTAL TERMINALS | § | JURY TRIAL DEMANDED |
| COMPANY, LLC, JOHNSON CONTROLS | § | |
| INC., TYCO FIRE PRODUCTS, LP, THE | § | |
| ANSUL COMPANY, CHEMGUARD, INC., | § | |
| NATIONAL FOAM, INC., KIDDE-FENWAL, | § | |
| INC., KIDDE FIRE FIGHTING, INC., US | § | |
| PUMP COMPANY, LLC, WILLIAMS FIRE | § | |
| & HAZARD CONTROL, NSK LIMITED, | § | |
| NSK CORPORATION, NSK PRECISION | § | |
| AMERICA, INC., NSK-AKS PRECISION | § | |
| BALL COMPANY, and APPLIED | § | |
| INDUSTRIAL TECHNOLOGIES, INC., | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

1.    Plaintiff Sherry Lynn Villarreal ("Plaintiff") brings this case against Intercontinental Terminals Company LLC ("ITC"), Johnson Controls Inc., Tyco Fire Products, LP, The Ansul Company, Chemguard, Inc., National Foam, Inc., Kidde-Fenwal, Inc., Kidde Fire Fighting, Inc., US Pump Company, LLC, Williams Fire & Hazard Control, NSK Limited, NSK Corporation, NSK Precision America, Inc., NSK-AKS Precision Ball Company, Applied Industrial Technologies, Inc. (collectively "Defendants") arising out of a fire at ITC's tank yard in Deer Park, Texas during the morning of March 17, 2019. The tank fire at ITC's facility burned for days while churning out massive plumes of toxic smoke across the communities of Harris County. First responders struggled to contain the fire and ITC's own actions and inactions caused an increase in the fire's severity. The fire caused injury and damages to Plaintiff.

2.     During the fire, industrial firefighting foam was used in an attempt to suppress the fire. The foam that was used contained Per- and Polyfluoroalkyl substances (hereinafter "PFAS"). PFAS is a group of manmade chemicals that have been known to cause adverse health outcomes in humans. (See https://www.epa.gov/pfas/basic-information-pfas). PFAS can cause reproductive and developmental, liver and kidney, and immunological effects. (*See id.*). PFAS chemicals can accumulate in the body and stay in humans for long periods of time. (*See id.*). For that reason, PFAS chemicals have been called the "Forever Chemicals." (See https://www.forbes.com/sites/brucelee/2020/01/23/what-is-in-your-drinking-water-how-about-pfas-forever-chemicals-report-warns/?sh=688650459065 ). While battling the growing fire, Plaintiff alleges she was probably exposed to PFAS and suffered injuries as a result.

3.     Defendants Johnson Controls International PLC, Tyco Fire Products, LP, The Ansul Company, Chemguard, Inc., National Foam, Inc., Kidde-Fenwal, Inc., Kidde Fire Fighting, Inc., US Pump Company, LLC, and Williams Fire & Hazard Control manufactured, sold, and distributed the firefighting foam used during the ITC fire despite their knowledge and awareness that the inclusion of PFAS in the foam presented an unreasonable risk to human health and the environment and was inherently dangerous. These entities are collectively referred to as the "Foam Defendants." The Foam Defendants marketed and sold their products with knowledge that the firefighting foam it sold contained PFAS, including PFOA and PFOS, and that such chemicals were dangerous and harmful to others. The Foam Defendants failed in their duty to manufacture a product that would not

cause widespread harm and in their duty to warn their customers of the inherently dangerous properties of their firefighting foam.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction over Plaintiffs' claims pursuant to Diversity and Ancillary Jurisdiction. The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000,000.

5.      This Court has personal jurisdiction over Defendants, ITC, NSK Corp., NSK Precision, NSK-AKS, Applied, Johnson Controls, Inc., Tyco Fire Products, LP, The Ansul Company, Williams Fire & Hazard Control, Kidde-Fire Fighting, Inc., Kidde-Fenwal, Inc., National Foam, Inc., and US Pump Company, LLC because they have purposefully availed themselves of the privileges of conducting activities in the state of Texas and established minimum contacts sufficient to confer jurisdiction. Said Defendants do business in Texas, advertise in Texas, markets to Texas consumers, and the violations of the law forming the basis of this lawsuit occurred in Texas. Therefore, the assumption of jurisdiction over said Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process. Said Defendants also had and continue to have continuous and systematic contacts with the State of Texas sufficient to establish general jurisdiction over them.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise the claims in this Complaint took place in this district.

**PARTIES**

7.     Plaintiff Sherry Lynn Villarreal is a resident of southeast Houston, Harris County, Texas. During the relevant time period, Plaintiff Villarreal resided at 10603 Southdown Trace Trail, Houston, Texas 77034.

8.     Defendant Intercontinental Terminals Company, LLC, is a limited liability company authorized to conduct business in the State of Texas. ITC's sole member, Mitsui U.S.A., is a New York Corporation with its principal place of business in New York. ITC operates a facility in Harris County, Texas (the "ITC Facility"). ITC maintains a corporate office at 1021 Main Street, Suite 1150, Houston, Texas 77002-6508. Said Defendant may be served with process by and through its registered agent for service of process CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

9.     Defendant NSK Corporation ("NSK Corp.") is a foreign corporation located at 4200 Goss Road, Ann Arbor, Michigan 48105. NSK Corp. is incorporated under the laws of the State of Delaware, has its principal place of business in Michigan, and is authorized to conduct business in the State of Texas. NSK Corp. may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

10.     Defendant NSK Precision America, Inc. ("NSK Precision") is a foreign corporation incorporated under the laws of the State of Delaware with its principal place of business at 3450 Bearing Drive, Franklin, IN 46131. NSK Precision can be served with process through its registered agent for service of process the Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

11.     Defendant SK-AKS Precision Ball Company ("NSK-AKS") is a foreign corporation located at 1100 N. 1st Street, Clarinda, Iowa 51632. NSK-AKS is a Delaware corporation with its principal place of business in the State of Iowa. NSK-AKS may be served process through its registered agent the Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

12.     NSK Corp., NSK Precision, and NSK-AKS shall be collectively referred to as the "NSK Defendants."

13.     Defendant Applied Technologies, Inc. ("Applied") is a foreign corporation that is  authorized to conduct business in the State of Texas. It may be served through its registered agent, Cogency Global, Inc., at 1601 Elm Street, Suite 4360, Dallas, Texas 75201.

14.     Defendant  Johnson Controls, Inc. is a Wisconsin corporation authorized to conduct business in the State of Texas. Said Defendant may be  served with process by and through its  registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

15.     Defendant Tyco Fire Products, LP is a Delaware company authorized to conduct business in the State of Texas. Said Defendant may be served with process by and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

16.     Defendant The Ansul Company is a company that was purchased and is owned by Defendant Tyco Fire Products, LP. Defendant Tyco manufactures the Ansul brand of products and is the successor-in-interest to the company formerly known as The Ansul Company. Said Defendant may be served  with process by and through its

registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

17.     Defendant Williams Fire & Hazard Control is a company that was purchased and is owned by Defendant Tyco Fire Products, LP. Defendant Tyco manufactures the Williams Fire & Hazard Control brand of products and is the successor-in-interest to the company formerly known as Williams Fire & Hazard Control. Said Defendant may be served with process by and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

18.     Defendant Chemguard, Inc. is a Texas corporation. Said Defendant may be served with process by and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

19.     Defendant Kidde-Fire Fighting, Inc. is a Pennsylvania corporation authorized to conduct business in the State of Texas. Said Defendant may be served with process by and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

20.     Defendant Kidde-Fenwal, Inc. is a Delaware corporation authorized to conduct business in the State of Texas. Said Defendant is the successor-in-interest to Kidde Fire Fighting, Inc. Defendant Kidde-Fenwal, Inc. may be served with process by and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

21.     Defendant National Foam, Inc. is a Delaware corporation authorized to conduct business in the State of Texas. Said Defendant may be served with process by

and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

22.     Defendant US Pump Company, LLC is a Delaware company authorized to conduct business in the State of Texas. Said Defendant may be served with process by and through its registered agent for service of process CT Corporation at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

23.     Upon information and belief, Defendant Johnson Controls, Inc. owns, operates, and controls Defendants Tyco Fire Products, LP and Chemguard, Inc. At all relevant times, Defendants Tyco Fire Products, LP and Chemguard, Inc. manufactured, marketed, promoted, distributed, and/or sold Aqueous Fire Fighting Foam that contained PFAS chemicals, such as PFOA, PFOS, and other toxic substances that were used during the ITC fire. Upon information and belief, these chemicals were manufactured, marketed, promoted, distributed and/or sold at the direction of Defendant Johnson Controls, Inc.

## FACTUAL BACKGROUND

<u>Health Effects of PFAS</u>

24.     PFAS are chemical compounds containing fluorine and carbon atoms. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

25.     PFAS chemicals have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break

down very slowly, (ii) tend to accumulate in organisms, and (3) are toxic such that they pose serious health risks to humans.

26.     PFAS chemicals are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, they resist degradation due to light, water, and aging.

27.     These chemicals accumulate in the human body over time. Because of their stability, any newly ingested PFAS chemicals will be added to any such existing chemicals already present in the body.  These chemicals remain in the body for years.

28.     The chemical structure of PFAS substances make them resistant to breakdown or environmental degradation. As a result, they are persistent when released and ingested.

29.     Exposure to PFAS chemicals, including PFOA and PFOS, can be toxic and pose serious health risks to humans.

30.     Many parties have studied the effects of PFAS, including PFOA and PFOS, and have concluded that exposure to such chemicals is associated with the development of numerous serious medical conditions. These chemicals were the subject of a study formed out of a class action settlement arising out of water contamination from DuPont's Washington Works facility in Wood County, West Virginia.

31.     The science panel involved in that case consisted of three epidemiologists specifically tasked with determining whether there was a link between PFAS exposure and human diseases. In 2012, the panel found a probable link between PFAS, including PFOA and PFOS, and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease,

pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

32.    In May 2015, based on concerns about these chemicals being released into the environment, scientists and other professionals from a variety of disciplines issued the "Madrid Statement on Poly-and Perfluoroalkyl Substances (PFASs)," a policy statement calling for greater regulations, restrictions, and limits on the manufacture and handling of any such chemicals as well as the development of safe, non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.

33.    In May 2016, the United States Environmental Protection Agency issued Lifetime Health Advisories against exposures to PFAS chemicals PFOA and PFOS.

**Background of ITC Fire**

34.    ITC operates a storage facility in the petrochemical industry. ITC owns and operates two terminals for its business in the Houston area. As its website stated, "[t]he ITC Deer Park terminal started in 1972 and currently has 13.1 million barrels (2.2 million cbm) of capacity in 242 tanks. It stores all kinds of petrochemical liquids and gases, as well as fuel oil, bunker oil and distillates. The terminal has five ship docks and ten barge docks, rail and truck access, as well as multiple pipeline connections." (*See* https://www.iterm.com/).

35.    ITC stores various hazardous chemicals in a "tank farm" located on its premises. The tanks located within the farm are 80,000-barrel tanks. A barrel contains 42 gallons and thus, each tank contains 3,360,000 gallons of hazardous chemicals. These tanks are approximately 120 feet tall and 40 feet in diameter. The tank farm itself is 328,000 square feet and contains 15 tanks.



Pre-Fire Photo of 80's Tank Farm Labeled with Contents

36.    Although ITC stores numerous hazardous chemicals in large, building size tanks,

ITC did not have an automatic fire alarm system in its tank farm. ITC did have a fire monitor,

however, this monitor was not properly maintained by ITC and malfunctioned on the day the fire

first started. (*See* Exhibit "1"[1] – Harris County Fire Marshal's Report at page 85).

37.    In addition, each tank contains a motor and set of pipes that are used to pump

products in and out of the tanks. This is known as the "manifold power frame."

---

[1] For the sake of brevity and to avoid unnecessary duplication, Exhibits 1, 2, 3, and 4 referenced herein are the same numbered exhibits found in Cause No. 4:21-cv-00273, a class action lawsuit filed January 27, 2021 in this Houston Division styled Steven Brett Ogden and Brandon Michael Martin, et al v. Interncontinental Terminals Company, LLC, et al (Dkt. 1). And, as is readily observable, Plaintiff Villarreal's instant pleadings are taken much from that complaint, her counsel acknowledging substantial involvement and discovery efforts of/for the named and class Plaintiffs over 1 1/2 years in that case by Plaintiff's counsel.

38.     This lawsuit arises out of a fire in ITC's tank yard during the morning of March 17, 2019 at ITC's Deer Park terminal when the manifold power frame in tank 80-8 suffered a mechanical failure due to lack of maintenance. (*See id.* at page 88.) This mechanical failure caused a leak and subsequent ignition of the fire. (*See id.*; *see also* Exhibit "2" – Bureau of Alcohol, Tobacco, Firearms and Explosives Cause and Origin Report at page 21 stating: "A failure occurred within the manifold power frame, somewhere between the electric motor and the impeller of the pump. This failure resulted in the release of Naphtha.").

39.     For approximately 30 minutes prior to the fire's ignition, roughly 9,000 gallons of Naphtha and Butane were released from the 80-8 tank. ITC did not have adequate release detection systems and failed to detect the 9,000 gallon release prior to the fire ignition. (*See* Exhibit "1" – Harris County Fire Marshal's Report at page 86).

40.     In particular, at approximately 10:00 am on March 17, 2019, the fire started at tank 80-8 after employees of ITC heard a loud noise like "rail cars coupling." (*See* Ex. "1" at page 87). Another employee heard a "loud pop" and almost instantly saw the fire. (Ex. "2" at page 5). Tank 80-8 contained approximately 75,000 barrels of the chemical Naphtha. After tank 80-8 caught fire, the fire quickly spread throughout the tank farm and other tanks within the farm containing Toluene, Gas Blend, Xylene, Pyrolosis Gasoline, and base oils caught on fire.



41.    Ten of the 15 tanks in the farm were soon consumed by the flames of the fire. This fire sent massive plumes of black toxic fumes and smoke over and into the communities of southeast Texas, including the southeast Houston area in which Plaintiff resided. A shelter in place order was issued for the City of Deer Park on March 17, 2019 as a result of the fire.

42.    This massive cloud of smoke contained dangerous chemicals, ash, and fumes, which spread into the Deer Park, Pasadena, Sheldon, Channelview, Galena Park, Jacinto City and neighboring communities within southeast Houston, to include Plaintiff's residence area.



43.    ITCs' tanks burned for three days while churning out the massive plumes of smoke until the fire was extinguished for several hours on March 20, 2019. To contain the fire, firefighting foam and water were applied to all tanks. The foam that was used to try to suppress the fire included, but was not limited to, Ansulite 3% AFFF which contained Polyfluorinated alkyl betaine – a type of PFAS chemical. Additionally, Thunderstorm W813A 1X3 AR-AFFF was used as well. This foam included Polyfluorinated alkyl polyamide, Polyfluorinated alkyl betaine, and Polyfluorinated alkyl quaternary amine chloride – all of which are types of PFAS chemicals.

44.    Although it was believed that this fire was extinguished, at approximately 5:49 p.m. on March 20, tanks 80-5 and 80-8 reignited. The fire was tampered down later that day. However, the fire again reignited on March 21st, when at approximately 3:40 pm three tanks reignited. The fire spread from the containment area through the breached

containment wall into the ditch on Tidal Road. Elevated Benzene levels were detected on March 21. This blaze grew stronger and the following day, March 22, 2019, the Pasadena, La Porte, and Deer Park school districts cancelled classes for there was a concern that elevated Benzene levels would continue from the fire. (*See* Exhibit "3" – EPA Pollution Situation Report at page Munoz 38986). The fire continued to burn until March 23, 2019.

45.     Throughout the entire fire and for days after the fire concluded, foam was used to suppress the fire and prevent re-ignition. (*See id*.) The following is a picture of the tank farm following the fire.



46.    ITC engaged in numerous negligent acts and omissions. For example, ITC failed to properly maintain and monitor their tanks. Indeed, ITC failed to maintain the mechanical motor in tank 80-8 causing it to fail and start the fire. ITC also failed to install a sufficient fire control system which would have prevented the fire from spreading to multiple tanks in the farm. As a result of ITC's conduct, fires were started on its premises which released numerous chemicals into the air including; PFAs, Naphtha, Xylene, Touene, and Benzene. Plaintiff was probalby exposed to these harmful chemicals.

47.    ITC's post-incident investigation revealed that, on December 4, 2018, ITC employees noticed that the Tank 80-8 pump was "unusually loud." A subsequent inspection of the pump determined that it was in need of new bearings. The pump was disassembled, and ITC's millwrights installed new NSK Model 5313 outboard bearings and NSK Model 6313 inboard bearings to support the pump's shaft. The remainder of the pump was then reassembled and placed into operation on the Tank 80-8 manifold.

48.    It was determined that on March 17, 2019, the NSK 5313 outboard bearing failed, causing vibrations within the impeller shaft that were directly transmitted to the mechanical shaft seal. This vibration loosened the bolted connections holding the mechanical shaft seal in place. Once the seal broke, the Naphtha escaped into the area around the Tank 80-8 pump, where it ignited and caused the incident.

49.    When the Tank 80-8 pump was disassembled to determine the cause of the incident, investigators observed that the outboard bearing (constructed using NSK 5313 bearings) had come apart, resulting in loose bearing balls and ball remnants in the bearing house, meaning that at the time of the incident the outboard bearing was no longer

capable of supporting the mechanical shaft centered in the bearing house. Most of these balls were severely deformed and/or fragmented.

50.    A subsequent metallurgical examination revealed that the Model 5313 outward bearings contained unexplained internal voids, meaning they were not as durable as solid-core ball bearings and were more likely to fail. By contrast, the NSK 6313 inward bearings examined from the incident were solid throughout as demonstrated by the below diagrams:

*__Cross Section of Nominally Intact NSK 5313 Ball Bearing from The Incident:__*



*__Cross Section of Nominally Intact NSK 6313 Ball Bearing from The Incident:__*



51.     Upon information and belief, the design and specifications for the Model 5313 ball bearings did not call for internal voids, but instead called for solid core ball bearings. The internal voids were therefore a deviation from the intended specifications. The NSK Defendants designed and manufactured the Model 5313 ball bearings.

52.     The Model 5313 ball bearings were sold to ITC by Defendant Applied.

**PFAS Exposure**

53.     As noted herein, foam containing PFAS chemicals were used to suppress the fire as soon as the fire started. This foam was used from March 17, 2019 to at least April 7, 2019 (*See* Exhibit "3"; Exhibit "4" – Timeline of Events). ITC supplied the foam that was used to suppress the fire. This foam was dangerous and harmful to all those individuals exposed to same.

54.     As noted above, PFAS is a manmade, manufactured chemical not found in nature that belongs to a group of fluorine-containing chemicals called perfluorinated chemicals (PFCs). These chemicals were and are used to make commercial products that resist heat and chemical reactions, and repel oil, stains, grease, and water.

55.     PFAS chemicals are readily absorbed after consumption or inhalation, and they accumulate primarily in the blood stream, kidney and liver.

56.     In fact, for over 50 years, PFAS chemicals have been known to be dangerous and harmful to humans as these chemicals can build up in blood over time to cause lethal effects on the body.

57.     Numerous studies have been conducted over the years describing the harmful effects of PFAS. Indeed, by the 1960s, animal studies performed by 3M and DuPont revealed that PFAS chemicals could pose significant health risks. First, in 1950,

Page 17

a study was conducted by 3M on mice which revealed that PFAS builds up in blood. In 1956, Stanford University conducted a study which found that PFAS binds to proteins in human blood. In 1961, DuPont toxicologists warn that PFAS chemicals enlarge rat and rabbit livers. In 1962, volunteers who smoke PFAS- laced cigarettes contract "polymer fume fever." The following year, a 3M technical manual deems PFAS toxic.

58.    The following timeline of events establishes that PFAS is harmful and causes sever health risks:

a.    1965 – DuPont rat study shows liver damage and increased spleen size.

b.    1966 – 3M study finds that PFAS causes "acute oral toxicity" in rats.

c.    1970 – 3M warns Fire Journal, the magazine of the National Fire Protection Association, that PFAS is toxic to fish.

d.    1970 – DuPont scientists determine that PFAS is "highly toxic when inhaled."

e.    In or about 1977, Defendant Ansul was also aware of the environmental and toxic concerns of its Aqueous Fire Fighting Foam and undertook a study and investigation on more environmentally improved versions of the product.

f.    1978 – 3M animal tests find lesions on spleen, lymph nodes and bone marrow.

g.    1981 – 3M and DuPont reassign female workers after animal studies reveal PFAS damages the eyes of the developing fetus.

h.    1983 –  3M identifies PFAS' potential harm to the immune system as a cause for concern.

i.    1989 – 3M study finds elevated cancer rates among PFAS workers.

j.    1997 – DuPont study finds heightened cancer rates among workers at the Parkersburg plant.

k.      A 1997 material safety data sheet ("MSDS") for a product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

l.      1998 – 3M provides EPA evidence that PFAS accumulates in blood.

m.      1998 – the EPA began investigating the safety of PFAS chemicals after the limited disclosure by 3M.

n.      1998 – 3M animal study finds liver damage from PFAS exposure.

o.      2003 – 3M conducts a mortality study of its workers exposed to PFOS (closely related to PFAS) and reported excess bladder cancer incidence with high exposure jobs.

p.      2005 – the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

q.      2009 – 3M performed a follow-up study of its workers who were exposed and an increase in prostate case incidence was reported.

r.      2009 – EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. (*See* https://www.epa.gov/sites/production/files/2015-09/documents/pfoa-pfos-provisional.pdf)

s.      2015 – The "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)" was issued by scientists and other professionals from a variety of disciplines which called for greater regulation, restriction, and limits on the manufacture and production of productions containing PFAS chemicals and called to develop safer alternatives to these products to avoid long-term harm to human health. (*See* Arlene

Blum, Simona A. Balan, Martin Scheringer, Xenia Trier, Gretta Goldenman, Ian T. Cousins, Miriam Diamond, Tony Fletcher, Christopher Higgins, Avery E. Lindeman, Graham Peaslee, Pim de Voogt, Zhanyun Wang, and Roland Weber. The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's). Environ Health Perspect 123:A107-A111).

59.    In February 2020, the EPA issued its PFAS action plan designed to curb the harmful effects of PFAS. The action plan can be found at https://www.epa.gov/sites/production/files/2020-01/documents/pfas_action_plan_feb2020.pdf.

60.    The administrator of the EPA stated as follows:

Last year, the U.S. Environmental Protection Agency (EPA) issued the first-ever PFAS Action Plan—a historic step in our nation's efforts to address per- and polyfluoroalkyl substances (PFAS) in the environment. The Action Plan represented a number of important firsts for the agency. It was the first time we have used all of our program offices to deal with an emerging chemical of concern. It was also the first time the agency had put together a multi-media, multi-program national research and risk communication plan to address a challenge like PFAS.

(*Id.*)

61.    PFAS can remain in the environment for many years. PFAS can move through the soil and into groundwater, or be carried in air and inhaled. Human studies show associations between increased PFAS levels in blood and an increased risk of severe health effects, including effects on the liver, the immune system, high cholesterol levels, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

62.    These injuries can arise months or years after exposure to PFAS.

63.    PFAS's extreme persistence in the environment and its toxicity, mobility, and bioaccumulation potential, pose potential adverse effects to human health and the environment.

**Signicant PFAS Foam Was Used During the ITC Fire**

64.    Aqueous Fire Fighting Foam ("AFFF") is a Class-B fire fighting foam that is mixed with water and is used to extinguish fires that are difficult to fight, including those involving hydrocarbon fuels such as petroleum or other flammable liquids.

65.    AFFF is synthetically formed by combing fluorine free hydrocarbon foaming agents with surfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation of "aqueous film forming foam."

66.    By at least the end of the 1990s, additional research and testing indicated that chemicals from PFAS can cause Lydig cell (testicular) cancer, liver cancer, and pancreatic cancer.

67.    Nevertheless, the Foam Defendants voluntarily elected to manufacture firefighting foam with such PFAS chemicals, including PFOAs and PFOS.

68.    The Foam Defendants knew or should have known that PFAS chemicals present significant risks to human health and welfare.

69.    Yet, the Foam Defendants manufactured, marketed, and sold their AFFF with knowledge that they contained PFAS chemicals that when released would lead to dangers and harmful effects on human health.

70.    Moreover, the instructions, labels, and material safety data sheets provided with the AFFF manufactured, marketed, and sold by the Foam Defendants did not fully describe the health and environmental hazards of AFFF which the Foam Defendants knew or should have known at the time of manufacture or distribution.

71.    Upon information and belief, the Foam Defendants knew of the health and environmental hazards for years and yet failed to warn consumers and the public of the dangerous effects of PFAS chemicals.

72.    Plaintiff was never told by the Foam Defendants of the health risks and hazards of using the Foam Defendants' AFFF.

73.    Federal law imposes a duty on chemical manufacturers and distributors to immediately notify the Environmental Protection Agency if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e). The Foam Defendants have not complied with this duty. The Foam Defendants knew or should have known that their AFFF containing PFAS chemicals, including PFOA or PFOS, would very likely injure and/or threaten the health of others.

74.    On information and belief, this knowledge was made available to the Foam Defendants. In 1970, a firefighting trade association was alerted to the toxic effects on fish of PFAS chemicals. Defendants Ansul, Chemguard, and National Foam were members of this trade association.

75.    Nevertheless, the Foam Defendants continued to manufacture AFFF containing PFAS chemicals, including PFOA and PFOS. The AFFF used to combat the

ITC fire that was manufactured by the Foam Defendants contained PFAS chemicals, including PFOA and PFOS.

76.     From March 17 to April 2019, significant amounts of AFFF containing PFAS chemicals was used. For example, Ansulite 3% AFFF, which contains Polyfluorinated alkyl betaine – a type of PFAS chemical – was used. Additionally, Thunderstorm W813A 1X3 AR- AFFF was used. This foam includes Polyfluorinated alkyl polyamide, Polyfluorinated alkyl betaine, and Polyfluorinated alkyl quaternary amine chloride – each of which is a type of PFAS chemical. Also, Chemgaurd Ultraguard 3% AR-AFFF was used. This foam includes Fluorosurfatcant, which is a type of PFAS chemical. Further, Universal Gold 1%/3% Alcohol was used. This foam contains Fluoroalkyl Surfactants, which is a type of PFAS chemical. Moreover, Dwight P. Williams Signature Series 1% x 3% foam was used. This contains a mixture of Fluorosurfactants – which are a type of PFAS chemical.

77.     The AFFF that was used during the ITC fire, includes but is not limited to the following:

| FOAM NAME | MANUFACTURER | PFAS CHEMICAL |
|---|---|---|
| Ansulite 3% AFFF (AFC38) | Tyco Fire Products, LP & The Ansul Company | Polyfluorinated alkyl betaine |
| Dwight P Williams Signature Series 1% x 3% | US Fire Pump Company, LLC | Fluorosurfactants |

| Thurderstorm W813A 1X3 AR-AFFF | Tyco Fire Products, LP & Williams Fire & Hazard Control | Polyfluorinated alkyl polyamide Polyfluorinated alkyl betaine Polyfluorinated alkyl quaternary amine chloride |
|---|---|---|
| Chemguard Ultraguard 3%/AR-AFFF | Chemguard, Inc. | Fluorosurfactant |
| Universal Gold 1 % / 3 % Alcohol | National Foam, Inc., Kidde-Fenwal, Inc., & Kidde Fire Fighting, Inc. | Fluoroalkyl Surfactnats |

78.     The foam identified above was added approximately three times every four hours at a rate of 180,000 gallons of foam per foaming operating until the fire was suppressed on March 23, 2019. After the fire was suppressed at least another 460,000 gallons of foam was applied to prevent the fire from reigniting.

79.     The AFFF from the fire fighting operations was found in residential yards around the ITC facility, in the Houston Ship Channel, San Jacinto river and other locations in Southeast Harris County.

80.     In fact, harmful levels of PFOS, PFOA, and PFBS (each of which is derived from the AFFF used to suppress the ITC fire) were detected in the soil and surface water in southeast Harris County following the ITC fire. For instance, the water in Burnet Park in Baytown, Texas was found to contain PFOS at 200 ng/L (ppt) on April 11, 2019.

81.     The Foam Defendants each manufactured AFFF containing PFAS, including PFOA and PFOS, for sale and use to suppress the ITC fire. At all material times, the Foam Defendants were responsible for the design, manufacture, and sale of thousands of gallons of AFFF used during the ITC fire.

82.     The AFFF was expected to and did reach not only the first responders combatting the ITC fire, but also the residents of the surrounding communities, in conditions reasonably expected to occur after normal use during fire fighting operations and without substantial change in the condition in which the Foam Defendants manufactured and sold it.

83.     The instructions, warning labels, and material safety data sheets from the Foam Defendants provided with the AFFF did not reasonably or adequately describe the health hazards of AFFF that the Foam Defendants knew or should have known, including the risks of PFAS chemicals on the human body.

84.     Nevertheless, the Foam Defendants manufactured, marketed, and sold their AFFF with the knowledge that PFAS chemicals, including PFOS and PFOA, would be released into the environment during firefighting operations.

85.     The Foam Defendants knew of the health risks and yet failed to warn or take reasonable steps to ensure that their products were safe.

86.     The AFFF used in the ITC fire, on information and beliefs, was spread to the communities of Deer Park Pasadena, Sheldon, Channelview, Galena Park,  Jacinto City and the neighboring communities of southeast Houston. The residents in these communities breathed and ingested the AFFF containing harmful PFAS chemicals.

87.    The  first responders who responded to the ITC fire used the AFFF in their firefighting efforts. It has been alleged that they breathed and ingested the AFFF while performing their duties in spraying the AFFF for hours each day.

88.    It has been alleged that the first respondents and the residents of Deer Park, Pasadena, Sheldon, Channelview, Galena Park, Jacinto City and neighboring communities of southeast Houston were unaware of the health risks and hazards from the Foam Defendants' AFFF. Plaintiff was certaintly unaware.

89.    ITC supplied and provided the AFFF that contains the harmful PFAS chemicals to the first responders, for use during the fire. On information and belief, ITC knew of the harmful and dangerous effects of the Foam Defendants' AFFF and yet, failed to warn Plaintiff and residents similarily situated. Instead, ITC continued to allow the first responders to use the AFFF during the fire and fire fighting operations at issue, resulting in injuries.

90.    As a direct and proximate result of this failure to warn, the PFAS chemicals from the AFFF were permitted to enter the air and probably came in contact with the Plaintiff and those similarly situated. As such, harmful PFAS chemicals are probably now in Plaintiff's and those similary situated bodies affecting their health.

**Plaintiff Has Been Harmed From the ITC Fire**

91.    Plaintiff resdied at the time of the incident in question, near but just east of the intersection of Sam Houston Tollway and IH 45, with in approximately 2 miles from the western border of Pasadena, Texas.

92.    Plaintiff, as a result of the referenced expourse, came under the care of Dr. Maynak Patel for treatment. She has since come under the care of Dr. Nina Zatikyan, M.D. for continued treatments. She has had what she refers to as breathing treatments, steroids, and inhalers. Plaintiff has been to the emergency room at Methodist Hospital in Webster, Texas approximately 3 or 4 times for breathing difficulty episodes. She is currently being monitored for these continued breathing issues by her doctor. And, Plaintiff is and continues to be on medication as a result of these breathing issues.

93.    Thus, Plaintiff, too came in contact with and inhaled and/or ingested the smoke and toxic burned residue, ash, fumes and burned oil, gas, tolvene, xylene, and naphtha chemicals along with the AFFF manufactured by the Foam Defendants.She too experienced physical injuries, such as burning eyes, coughing, difficulty breathing, and other similar injuries.

94.    The smoke and toxic burned residue, ash, fumes and burned oil, gas, and other chemicals along with PFAS chemicals released during the ITC fire went into the air and was inhaled by Plaintiff for at least one week. As a result, Plaintiff has suffered exposure and bioaccumulation of the PFAS chemicals in her blood. Plaintiff seeks recovery from all Defendants for the injuries, damages, and losses suffered in an amount to be determined at trial, to include physical pain, mental anguish, physical impairment and medical expenses, past and future.

## CAUSATION

95.    Plaintiff incorporates all factual allegations made above.

96.    Defendant ITC caused the fire  due to its unlawful conduct described in

this Complaint.

97.    The NSK Defendants and Applied also caused the fired as a result of their unlawful conduct described in this Complaint.

98.    Each of the Foam Defendants manufactured, sold, and supplied harmful AFFF which was used to suppress the ITC fire. Each of the Foam Defendants' AFFF was inhaled and/or ingested by the Plaintiffs and Class Members and each of the Foam Defendants' AFFF caused the injuries described in this Complaint.

99.    Therefore, each of the acts and omissions described in this Complaint on the part of Defendants, taken separately and/or collectively, constitute a direct and proximate cause of Plaintiff's injuries and damages set forth.

100.    The amount of each Defendant's respective share of liability shall be determined by the jury.

## MEDICAL MONITORING

101.    As a result of Plaintiff's exposure to proven hazardous substances released into the environment by Defendants, Plaintiff is, in reasonable probability, at an increased risk of contracting serious latent diseases proximately caused by their exposure to the chemicals. Plaintiff's increased risk justifies reasonable and necessary periodic medical examinations which would make early detection and treatment possible and beneficial to Plaintiff.

## CAUSES OF ACTION

## COUNT I

## NEGLIGENCE AND GROSS NEGLIGENCE OF ITC

102.    Plaintiff incorporates by reference all preceding paragraphs as if fully stated herein and further states as follows:

103.    The acts and omissions of ITC constitute negligence and gross negligence, and separately and concurrently were a proximate cause of the incident upon which this suit is based, and of the injuries and damages suffered and sustained by Plaintiff. The negligent acts and omissions of ITC include the following:

a.    ITC failed to maintain equipment, including the Tank 80-8 manifold and seals;

b.    ITC failed to have in place a fixed foam fire suppression system for fire prevention, control or direct extinguishment of any flammable or combustible liquid fire within their tanks;

c.    ITC failed to have access to dry chemical and/or foam fire suppression materials to extinguish the fire after it started;

d.    ITC failed to adequately train workers regarding the hazards of injecting butane into tank manifolds;

e.    ITC failed to use ordinary care in developing and implementing a safety and fire prevention program;

f.    ITC failed to supervise and train workers to ensure that any safety guidelines in place would be enforced to protect against leaks when injecting butane into tank manifolds;

g.    ITC caused and permitted the release of volatile organic/inorganic compounds and chemicals resulting in a continuous toxic cloud over La Porte, Deer Park and other parts of Harris County, Texas; and

h.    ITC failed to use ordinary care in monitoring the release of air contaminants and providing adequate warnings to the community of the release of volatile organic/inorganic compounds and chemicals, including benzene and PFAS chemicals.

104.    Each of the foregoing acts and omissions, when taken separately or together, constitute negligence. Such acts were a direct and proximate cause of the

injuries and damages sustained by Plaintiff.

105.    The acts or omissions of ITC involved an extreme degree of risk of which it had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others. Specifically, ITC has a long history of incidents involving the release of toxic chemicals, as well as citations and fines from regulatory agencies. Even after these events, at the time of this catastrophic fire, ITC operated the facility with institutional ignorance or defiance to a culture of safety and accountability.

106.    The forgoing actions and inactions of ITC, and/or their respective employees or agents, whether taken separately or together, were of such a character as to constitute a pattern or practice of intentional wrongful conduct or malice resulting in the damages sustained by Plaintiffs and the Class Members. These acts or omissions satisfy both the objective and subjective elements of gross negligence which is governed by V.T.C.A., Civil Practice & Remedies Code §§ 41.001(11), 41.003(a). Indeed, ITC had actual awareness of the extreme degree of risk associated with the release of toxic chemicals and fires, and nevertheless proceeded with conscious indifference to the rights, safety, and welfare of Plaintiffs and the Class Members by failing to act to minimize or eliminate these risks. Therefore, ITC is guilty of gross negligence for which it should be held liable in punitive and exemplary damages to Plaintiffs and the Class Members.

## COUNT II

## PRODUCTS LIABILITY – NSK DEFENDANTS AND DEFENDANT APPLIED

A.    **Manufacturing Defect - NSK Defendants.**

107.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

108.    The NSK Defendants are engaged in the business of manufacturing and placing into the stream of commerce the NSK 5313 bearings that caused the incident that is the subject of this litigation. As such, the NSK Defendants are "manufacturer[s]" as that term is defined by Section 82.011(4) of the Texas Civil Practice & Remedies Code.

109.    NSK Defendants manufactured the NSK 5313 bearings and placed them into the stream of commerce with the expectation that those bearings would, and in fact did, reach the user or consumer without substantial change in the condition in which the bearings were sold.

110.    A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

111.    The NSK 5313 bearings, at the time they were placed into the stream of commerce by the NSK Defendants, were in a defective condition unreasonably dangerous to the end-user. Specifically, while the specification for the NSK 5313 bearings required that they contain a solid core, the bearings sold to ITC contained internal voids (*i.e.*, they had a hollow core) of approximately 0.33 inches. These internal voids caused the bearings to have a smaller diameter than would similar solid-core bearings, as well as an average mass of only 78% of the inboard bearing balls. This decreased size and mass caused the NSK 5313 ball bearings to deteriorate more quickly than if they had a solid core, causing them to fragment and come loose within the bearing.

112.    This fragmentation caused failure of the outboard bearing, which compromised resistance to thrust loading and generated the impeller shaft vibration that loosened the mechanical shaft seal and allowed the Naphtha to escape.

113.    The failure of the outboard bearing, the vibration of the impeller shaft, the loosening of the mechanical shaft seal, and the release of Naphtha would not have occurred if the NSK 5313 ball bearings—like their NSK 6313 counterparts—were manufactured with a solid core in accordance with their design specifications. As such, this dangerous condition was a proximate cause of the March 17, 2019 explosion at ITC's Deer Park Facility and Plaintiff's injuries and damages.

**B.    Design Defect - NSK Defendants.**

114.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

115.    In the alternative, to the extent that the NSK 5313 ball bearings did not deviate from their design specifications, the NSK Defendants are liable for Plaintiff's injuries because the design of the 5313 ball bearings was defective. To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery.

116.    The NSK Defendants' design of the NSK Model 5313 ball bearing was defective because it contained "internal voids" that rendered the bearing unreasonably dangerous for its intended use. Rather than design the bearing with internal voids, the NSK Defendants should have utilized the solid-core design found in NSK Model 6313. That this "solid core" alternative design is safer than the "internal void" design of the NSK 5313 ball bearing is demonstrated by the fact that the NSK 5313 bearings deteriorated and fragmented while the solid-core NSK 6313 bearings did not.

117.    Similarly, the existence and utilization of the NSK 6313 ball bearings in the inboard bearing demonstrates that the solid core design is both technologically and economically feasible.

118.    The "internal void" design was the producing cause of Plaintiff's injuries for the reasons discussed above. As such, the NSK Defendants are liable for Plaintiff's injuries and damages.

**C.    Products Liability Claims Against Defendant Applied**

119.    The allegations contained in the above paragraphs are hereby incorporated against Defendant Applied.

120.    Section 82.001(3) of the Texas Civil Practice and Remedies Code defines "seller" as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."

121.    As the distributors of the NSK Model 5313 ball bearings that were sold to and used by ITC, Defendant Applied is a "seller" as defined by the Texas Civil Practice and Remedies Code.

122.    Under Section 82.003 of the Texas Civil Practice & Remedies Code, "[a] seller that did not manufacture a product" may be held liable in a products liability action for any harm caused by that product under certain circumstances. For example, if "the claimant proves…(a)(7) that the manufacturer of the product is…not subject to the jurisdiction of the court," then the non- manufacturing distributor is liable under Section 82.003(a)(7).

123.    As such, if the Court is unable to exercise jurisdiction over the NSK Defendants—or if Plaintiffs prove any other element of Section 82.003—Defendant Applied

is liable for Plaintiff's injuries to the full extent that those injuries resulted from NSK's defective manufacturing and design of the NSK Model 5313 bearings.

## COUNT III

### NEGLIGENCE AND GROSS NEGLIENCE – FOAM DEFENDANTS

124.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

125.    The Foam Defendants knew or should have known that exposure to PFAS chemicals, including PFOA and PFOS, was hazardous to human health.

126.    Given that the Foam Defendants were aware of these chemicals' potential for bioaccumulation in humans as well as the links to numerous serious medical conditions, including cancer, the Foam Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS chemicals would be hazardous to human health.

127.    The Foam Defendants knew or should have known that PFAS chemicals are highly likely to injure others. The Foam Defendants also knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS chemicals would result in first responders using their AFFF.

128.    In fact, the Foam Defendants marketed and sold their products with knowledge that AFFF containing PFAS chemicals would be used in firefighting situations.

129.    Nevertheless, the Foam Defendants marketed and sold their products with knowledge that AFFF containing toxic PFAS chemicals would create an unreasonable risk of harm to first responders and the communities in close proximity to the use of the AFFF.

130.    Knowing of the dangerous and hazardous properties of AFFF, and the

manner in which AFFF would be used , it was reasonably foreseeable that AFFF would injure first responders and those individuals living in communities nearby.

131.    The Foam Defendants therefore knew or should have known that safety precautions would be required to prevent the release of harmful PFAS chemicals, including PFOA and PFOS.

132.    Further, the Foam Defendants should have acted reasonably by not placing inherently dangerous AFFF into the marketplace.

133.    Though AFFF is effective at extinguishing otherwise difficult fires, the potential for widespread and persistent harm and the development of numerous serious medical conditions far outweighs any social utility gained from AFFF's firefighting ability.

134.    The magnitude of the burden on the Foam Defendants to  guard against this foreseeable harm to Plaintiff was minimal, as the practical consequences of placing this burden on the Foam Defendants amounted to providing adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

135.    As manufacturers, the Foam Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

136.    Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on the Foam Defendants, the Foam Defendants owed multiple cognizable duties to Plaintiff.

137.    The Foam Defendants had a duty not to produce, manufacture, and place in the stream of commerce products that injure others, like Plaintiff.

138.    The Foam Defendants had a duty to warn of the hazards associated with AFFF containing PFAS chemicals.

139.    As manufacturers, marketers, and sellers of AFFF, the Foam Defendants owed Plaintiff a duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way that the end users of AFFF were aware of the potential harm from PFAS, including PFOA and PFOS.

140.    The Foam Defendants owed Plaintiff a duty to warn and notify them of the potential hazards of their AFFF before Plaintiff was injured.

141.    The Foam Defendants breached these duties.

142.    As a result, the Foam Defendants acted negligently, recklessly, willfully, wantonly, and/or intentionally and those actions caused the injuries to Plaintiff.

143.    The Foam Defendants' breaches of their duties were direct and proximate causes of the injuries, damages, and harm the Plaintiff has suffered to her health.

144.    The Plaintiff suffered foreseeable injuries and damages as a proximate result of the Foam Defendants' breach of their duties as set forth above. At the time the Foam Defendants breached their duties to Plaintiff, the Foam Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiff so apparent as to entitle them to be protected against such actions or inactions.

**COUNT IV**

**STRICT PRODUCTS LIABILITY – FOAM DEFENDANTS**
**FAILURE TO WARN**

145.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

146.    As commercial manufacturers, sellers, and distributors of AFFF, the Foam Defendants knew or should have known that exposure to PFAS chemicals, including PFOA and PFOS, was hazardous to human health.

147.    The Foam Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS was hazardous to human health.

148.    The Foam Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF would result in others, including first responders, being physically harmed.

149.    AFFF's persistence, mobility, bioaccumulative potential, and the medical and scientific link between PFAS chemicals and numerous serious medical conditions should have alerted the Foam Defendants to warn others.

150.    Though the Foam Defendants knew or should have known about the seriousness of the consequences of failing to warn about the inherent dangers associated with AFFF containing PFAS, the Foam Defendants failed to warn of the dangers inherent in the use of the product.

151.    Though the Foam Defendants knew or should have known about the reasonably foreseeable hazards to human health and welfare associated with the use of AFFF containing PFAS by first responders and the communities within close proximity to major fires that were suppressed by the use of AFFF containing PFAS, The Foam Defendants failed to provide adequate warnings of, or take any precautionary measures to mitigate, those hazards.

152.    The Foam Defendants failed to provide sufficient warning that the use of AFFF containing PFAS would cause the product to, in all reasonable probability, harm others.

153.    Adequate instructions and warnings on the AFFF products could have reduced or avoided these foreseeable risks of harm to Plaintiff.

154.    Had the Foam Defendants provided adequate warnings, Plaintiff could have taken measures to avoid or lessen her exposure.

155.    The Foam Defendants' failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders the AFFF a defective product.

156.    The Foam Defendants' failure to warn was a direct and proximate cause of the injuries Plaintiff.

157.    As a result of the Foam Defendants' conduct, Plaintiffhave been injured in that has exposure to PFAS, including PFOA and PFOS, has produced an increased level of such toxins in blood stream, leading to the bioaccumulation of PFAS in human bodies and significantly increasing her risk of developing numerous serious medical conditions.

158.    As a result of the Foam Defendants manufacture, sale, or distribution of a defective product, the Foam Defendants are strictly liable in damages to Plaintiff.

159.    The Foam Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

**COUNT V**
**STRICT PRODUCTS LIABILITY – FOAM**
**DEFENDANTS DESIGN DEFECT**

160.    Plaintiff hereby repeats, realleges,  and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

161.    By virtue of manufacturing, marketing, and selling AFFF containing PFAS chemicals, including PFOA and PFOS, the Foam Defendants had a strict duty not to place an unreasonably dangerous product into the stream of commerce that would injure others.

162.    The Foam Defendants knew or should have known that exposure to PFAS chemicals, including PFOA and PFOS, was hazardous to human health when it, or products containing it, were used in their foreseeable and intended manner.

163.    The chemical makeup of the AFFF that they produced includes significant amounts of PFAS, including PFOA and PFOS, rendering the AFFF unreasonably dangerous.

164.    Knowing of the dangerous and hazardous properties of AFFF due to research and testing, the Foam Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFAS, PFOA or PFOS.

165.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

166.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Plaintiff resulting from the Foam Defendants' manufacture, marketing, and sale of AFFF.

167.    As manufacturers of AFFF, the Foam Defendants not only had the ability to alter their product in such a way that maintained the firefighting abilities of the product while eliminating its inherently unsafe character, but also were in the best position to do so.

168.    The link between PFAS chemicals and numerous serious medical conditions are not open and obvious conditions or part of general public knowledge of using AFFF.

169.    Therefore, even though AFFF is useful for fighting difficult fires, the inherent risks associated with its use far outweigh any firefighting benefits, thereby rendering AFFF unreasonably dangerous.

170.    The manufacture, sale, and distribution of unreasonably dangerous AFFF renders the Foam Defendants' AFFF products defective.

171.    The Foam Defendants' defective design and formulation of AFFF is the direct and proximate cause of the injuries to Plaintiff.

172.    As a direct result of the Foam Defendants' design and formulation of their AFFF, Plaintiff has been injured in that her exposure to PFAS, including PFOA and PFOS, has produced an increased level of such toxins in blood stream, leading to the bioaccumulation of PFAS in human bodies and significantly increasing their risk of developing numerous serious medical conditions.

173.    As a result of the Foam Defendants manufacture, sale, or distribution of a defective product, the Foam Defendants are strictly liable in damages to Plaintiff.

174.    The Foam Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

### CLAIM FOR MEDICAL MONITORING – ALL DEFENDANTS

175.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

176.    Medical monitoring is especially appropriate in this case because the Plaintiff

and numerous others similarly situated (1) had significant exposure to a hazardous substance through the tortious actions of Defendants as described in this Complaint; (2) have an increased risk of contracting a serious latent disease from the exposure to the hazardous substances described in this Complaint; (3) the increased risk makes periodic diagnostic medical examinations reasonably necessary; and (4) procedures exist which make the early detection and treatment of disease possible and beneficial.

177.   The Plaintiff has been exposed to hazardous PFAS chemicals, including PFOA and PFOS, and other toxic substances that were released following the ITC fire.

178.   As described more fully above in this Complaint, PFAS exposures, including PFOA and PFOS exposure, seriously increase the risk of contracting numerous diseases.

179.   The significantly increased risks associated with exposure to PFAS, including PFOS and PFOA, make periodic diagnostic medical examinations reasonable and necessary.

180.   A thorough medical monitoring plan can and should be developed for the Plaintiff that will assist in the early detection and beneficial treatment of the numerous diseases that can develop as a result of exposure to PFAS chemicals.

### CLAIM FOR PUNITIVE DAMAGES – ALL DEFENDANTS

181.   Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

182.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that was done without regard to the consequences

or the safety of the Plaintiff and others similarly situated which caused the injuries described in this Complaint.

183.    Defendants' acts or omissions, which when viewed objectively from the standpoint of Defendants at the time of occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants had actual, subjective awareness of the risk involved in the above described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and others similarly situated.

184.    For that reason, Plaintiff seeks punitive damages.

## DAMAGES SOUGHT

185.    Plaintiff incorporates all factual allegations made above.

186.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused to suffer permanent injury.

187.    Plaintiff seeks the following:

a.     Establishing and funding a medical monitoring program, at Defendants' expense, to notify the Plaintiff and those similarly situated of the dangers of the chemicals that were released into the air, and to monitor and test the health of each Plaintiff and those similarly situated for future health risks, including cancer;

b.    Establishing a common fund on behalf of Plaintiff and those similarly situated so as to distribute any and all funds necessary to reimburse them for their medical expenses, treatments, and economic losses;

c.    Plaintiff's past and future medical expenses;

d.    Plaintiff's past and future physical pain, mental anguish and physical

impairement;

    e.  Punitive damages; and

    f.  Judgment against Defendants in the full amount awarded by the jury in an amount in excess of the minimum jurisdiction requirements in this case.

## JURY TRIAL DEMAND

188.   Plaintiff  hereby demand a trial by jury of any and all issues in this matter so triable pursuant to Federal Rules of Civil Procedure 38(b).

## PRAYER

189.   Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.    A declaration and judgment that Defendants acted with negligence, gross negligence,   and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiff;

B.    An order establishing a medical monitoring protocol for Plaintiff and these simularily situated;

C.    An award to Plaintiff of general, compensatory, exemplary, consequential, nominal, and punitive damages;

D.    An award of pre-judgment and post-judgment interest as provided by law, and

E.    An order for an award of attorney fees and costs, as provided by law; and

F.    An order for all such other relief that the court deems just and proper.

                  Respectfully submitted,
                  LAW OFFICES OF GENE S. HAGOOD
                  1520 E. Highway 6
                  Alvin, Texas 77511

(281)331-5757
Fax: (281)331-1105
*E-Service Email: firm@h-nlaw.com


BY:   /s/ Gene S. Hagood
        GENE S. HAGOOD, Attorney in Charge
        SBN #08698400, FBN #3475
        RYAN KING, Of Counsel
        SBN #24073263, FBN #1114926
        Attorneys for Plaintiff


*E-SERVED DOCUMENTS ARE ONLY ACCEPTED AT THE ABOVE DESIGNATED E-SERVICE EMAIL
ADDRESS. SERVICE ON ANY OTHER EMAIL ADDRESS WILL BE CONSIDERED INVALID.